UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DEBORAH S. O'QUINN )
)
V. ) NO. 2:14-CV-120
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review of the final decision of the defendant Commissioner denying the plaintiff's application for disability insurance benefits under the Social Security Act following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 10 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff alleges that the onset date of her disability was December 23, 2010. Plaintiff was 51 years of age at that time. She has a high school education. There is no dispute that she cannot perform her past relevant work.

Plaintiff's medical history is summarized in the defendant's brief as follows:

> Beginning several years prior to her alleged onset date of disability, Brett Odum, M.D., of Holston Medical Group, treated Plaintiff on an occasional basis for muscle and joint pain, stiffness, and left leg radiculopathy and numbness (Tr. 257-70, 328-32, 338-99). X-rays of Plaintiff's right shoulder taken in December 2009 were unremarkable (Tr. 281, 399). A cervical spine x-ray taken in March 2012 showed degenerative disc disease with a posterior small spur at C5-6 and mild to moderate spondylosis bilaterally at C5-6 (Tr. 257, 323, 336). X-rays of Plaintiff's lumbar spine revealed mild to moderate degenerative loss of disc space height at L1- L2 and L2-L3 disc levels (Tr. 258, 322, 337). Physical examination revealed a normal gait, no joint swelling, normal movements of all extremities, no joint instability, intact deep tendon reflexes, normal sensory examination, a normal motor examination (Tr. 262, 266, 269, 330-31, 349, 385, 395). Dr. Odum diagnosed arthralgias and prescribed medication (Tr. 257-70, 331-32, 338-99). In March 2012, Plaintiff complained to Dr. Odum that she did not feel she could stand for long periods and asked him about "cashing in for her disability" (Tr. 328). She stated that she had no issues with sitting or ambulating (Tr. 328). He told her that he did not determine disability and told her to go see another doctor (Tr. 328).
> In April 2012, Zang Song, M.D., a rheumatologist, examined Plaintiff for complaints of neck and back pain and joint pain in multiple sites including shoulders, hips, knees, hands (Tr. 316-19). Physical examination revealed normal muscle strength and normal deep tendon reflexes in the upper and lower extremities and normal stance and gait (Tr. 318). All of Plaintiff's joints had normal range of motion (Tr. 318). There was no active swelling or erythema in any joints (Tr. 318). There were no neurological symptoms (Tr. 316). Dr. Song stated that Plaintiff's clinical

picture was consistent with early osteoarthritis or overuse pain (Tr. 319). He assured Plaintiff that she did not have joint inflammation (Tr. 14, 319). He increased her dosage of Tramadol and instructed Plaintiff to do stretching exercises and to return in three months (Tr. 319). The record does not reflect further treatment by Dr. Odum, Dr. Song, or Holston Medical Group (Tr. 14).

That month, in April 2012, Plaintiff began treatment with Patricia Vanover, M.D., of Haysi Clinic (Tr. 418-20). She complained of multi-area joint and muscle pain and excessive fatigue (Tr. 418). Examination revealed multiple trigger areas in a pattern consistent with fibromyalgia syndrome (Tr. 419). Otherwise, Plaintiff's physical examination was within normal limits (Tr. 419). Dr. Vanover noted that Plaintiff appeared slightly depressed (Tr. 419). She was oriented with normal judgment and insight (Tr. 419). Dr. Vanover assessed fibromyalgia syndrome, multi-area joint pain, depression, hypothyroidism, and restless leg syndrome (Tr. 420). She prescribed Cymbalta and Mirapax and instructed Plaintiff to continue with the other medications prescribed by Dr. Odum (Tr. 420). Plaintiff's physical examination and Dr. Vanover's assessment and plan were unchanged in May and July 2012 (Tr. 412-17).

In September 2012, Plaintiff sought treatment for depression (Tr. 435). She reported having restricted activities, an estranged relationship with daughter, and suicidal thoughts years earlier following her divorce (Tr. 435). Upon clinical examination, Plaintiff was observed to have appropriate hygiene and grooming (Tr. 435). She was tearful with a depressed mood (Tr. 435). There was no obvious psychosis (Tr. 435). Impression was rule-out major depression; chronic pain (Tr. 435). Plaintiff was instructed to return as needed, and a return appointment was not scheduled (Tr. 435).

Plaintiff reported acute back pain to Dr. Vanover in September 2012 (Tr. 425). She also reported that "several days" during the past two weeks, she had little pleasure in doing things and had been feeling down, depressed, or hopeless (Tr. 426). Examination revealed that Plaintiff had a limping gait (Tr. 426). She had normal lumbar lordosis (Tr. 426). She had lumbar spine tenderness with restricted range of motion secondary to pain (Tr. 426). Her lumbar spine was stable (Tr. 426). Plaintiff displayed appropriate judgment, good insight, intact recent and remote memory, a euthymic mood, and an appropriate affect (Tr. 426). She was described as well nourished, well developed, and in no acute distress (Tr. 426). She was awake and alert (Tr. 426). Cardiovascular and respiratory findings were normal (Tr. 426). In October 2012, Plaintiff told Dr. Vanover that she had experienced a difficult time since her last visit and that her pain was steadily getting worse (Tr. 409). She had pain all over her body, present all day long and worse at night (Tr. 409). Her physical examination was unchanged since September 2012, as was Dr. Vanover's assessment and plan (Tr. 410-11).

In December 2012, Plaintiff complained to Dr. Vanover of numbness in her left leg, a pulling sensation in the bottom of her left foot, and left elbow pain (Tr. 406). She reported that her pain continued to worsen all the time (Tr. 406). She stated that she was under a great deal of stress because she was unable to work and things

3

were getting tight financially (Tr. 406). She stated that her medications were working, but she did not like the thought that she had to take medications at all (Tr. 406). She also did not like the fact that she could not do what she wanted to do and what she used to do (Tr. 406). Examination revealed that Plaintiff had a limping gait (Tr. 407). She had normal lumbar lordosis and lumbar spine tenderness with restricted range of motion secondary to pain (Tr. 407). Her lumbar spine was stable (Tr. 407). Plaintiff displayed appropriate judgment, good insight, intact recent and remote memory, a euthymic mood, and an appropriate affect (Tr. 407). She was awake and alert and was described as well-nourished, well developed, and in no acute distress (Tr. 407). Cardiovascular and respiratory findings were normal (Tr. 15, 407). Other diagnoses included benign essential hypertension, headache, allergic rhinitis, unspecified hyperlipidemia, lumbago, and myalgia and myositis (Tr. 407). Her examination and Dr. Vanover's assessment and plan were unchanged in February 2013 (Tr. 429-30) and May 2013 (Tr. 456-58). At many of her visits, Dr. Vanover instructed Plaintiff to stretch daily and exercise as much as possible (Tr. 408, 414, 430, 458).

    Plaintiff returned for mental health treatment in April 2013, at which time she told Crystal Burke, LCSW, that she was taking medication for anxiety (Lorazepam) and Cymbalta (Tr. 433). She reported increased financial strain, increased frequency in crying, feelings of hopelessness, sleep disturbance, and frustrations with her health (Tr. 433). She stated that she resisted going to counseling because of the cost (Tr. 433). Ms. Burke noted that Plaintiff appeared depressed and appeared to have very poor coping strategies (Tr. 433). She assessed depressive disorder not otherwise specified (Tr. 434). Plaintiff was instructed to return in one month (Tr. 434), but the record does not reflect any further treatment notes from the clinic.

    In May 2013, at the request of Plaintiff's attorney, Andrew Steward, Ph.D., performed a psychological evaluation of Plaintiff (Tr. 441-49). She was appropriately dressed and groomed (Tr. 441). She was talkative and rapport was established (Tr. 411). She cried a lot during the evaluation (Tr. 411). She shifted and stood in pain at times (Tr. 441). Her affect was constricted with some lability and her mood was anxious and dysphoric (Tr. 422). She was oriented (Tr. 422). Her thought content was not impoverished or confused (Tr. 422). All mental functions including fund of information, judgment, abstract reasoning, ability to perform calculations, and attention and concentration fell within average ranges (Tr. 422). All memory functions, including immediate, recent, and remote, fell within essentially average ranges (Tr. 422). Plaintiff obtained a full-scale intelligence quotient (IQ) score of 96, reported as consistent with average intellectual ability (Tr. 445). On self-assessments, Plaintiff had elevated scores of somatic complaints, anxiety, anxiety-related disorders, depression, borderline tendencies, and stress (Tr. 447). Dr. Steward diagnosed major depressive disorder, recurrent, severe without psychotic features and generalized anxiety disorder (Tr. 449). He assessed a global assessment of functioning (GAF) score of 51 (Tr. 448). He opined that she appeared "permanently and totally disabled from any type of gainful employment currently and readily available in the United States economic market on a sustained basis for at least a year

4

or more" (Tr. 449). He stated that she had a rating of "poor/none" meaning "no useful ability to function" in her ability to relate to co-workers; deal with public; interact with supervisors; deal with work stresses; maintain attention and concentration; understand, remember, and carry out complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability (Tr. 450-51). Her ability was "fair" meaning "seriously limited resulting in unsatisfactory work performance" in her ability to follow work rules; use judgment when dealing with the public; function independently; understand, remember, and carry out detailed and simple job instructions; and maintain personal appearance (Tr. 450-51). He stated that she could manage her own benefits (Tr. 452). He anticipated that she would miss work more than two days each month as a result of her impairments or treatment (Tr. 452).

In June 2013, Dr. Vanover completed a physical assessment of Plaintiff's ability to do work-related activities (Tr. 460-62). She opined that Plaintiff could lift and carry 8 pounds occasionally and 5 pounds frequently (Tr. 460). She could stand, walk, and sit for 30 minutes at a time (Tr. 460-61). She could stand and walk for two hours total and could sit for three hours total during an eight-hour work day (Tr. 461). She could never kneel or crawl, occasionally climb, stoop, or crouch, and could frequently balance (Tr. 461). Plaintiff's ability to push and pull were affected by her impairment (Tr. 461). Her exposure to vibration was restricted (Tr. 462). Dr. Vanover indicated that Plaintiff could not handle work stressors (Tr. 462). She opined that Plaintiff's impairments or treatment would cause her to miss work more than two days each month (Tr. 462). Dr. Vanover provided no medical findings to support her assessments and did not indicate how Plaintiff's physical functions were affected (Tr. 460-62).

In July 2013, at the request of the State agency, Jonathan Wireman, M.D., performed a physical consultative examination of Plaintiff (Tr. 466-69). She was alert, without distress, well developed and well-nourished, and somewhat obese (Tr. 468). Her affect was appropriate and her cooperation was reasonable (Tr. 468). Upon physical examination, her heart and lung findings were normal (Tr. 468). Dr. Wireman observed that Plaintiff did not use an assistive device to ambulate (Tr. 468). The trigger point examination for fibromyalgia indicated Plaintiff was tender at 8 of 18 trigger points (Tr. 468). Her range of motion was reduced in the neck and slightly decreased in the lumbar spine and hips (Tr. 468). Range of motion in the shoulders, elbows, wrists, hands, knees, and ankles was normal (Tr. 468). There were no gross arthritic deformities, joint effusion, or laxity (Tr. 468). Straight leg raise was negative bilaterally (Tr. 468). Her station was normal and her gait was a little slow and slightly wide (Tr. 468). She was able to tandem walk and stand on her heels and toes and right and left leg alone (Tr. 468). She could squat and touch the ground (Tr. 468). Her strength was normal (Tr. 468). Light touch was intact throughout except for subjective changes in the left lateral thigh (Tr. 468). There was no tremor or ataxia noted (Tr. 468). Deep tendon reflexes were normal in the upper extremities and at the knees and ankles (Tr. 468). Grip strength was slightly decreased with limited effort (Tr. 468). Dr. Wireman assessed polyarthralgia; neck and back pain;

history of fibromyalgia; hypertension (controlled); hyperlipidemia (under treatment); hypothyroidism (treated); and obesity (Tr. 468-69). He opined that she could likely lift 30 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours during an 8-hour workday; and could handle her own affairs (Tr. 469).

Dr. Wireman completed a physical RFC assessment and opined that she could lift and carry up to 50 pounds occasionally and up to 10 pounds frequently due to her history of arthralgias (Tr. 475). She could walk for one hour continuously and six hours total during an eight-hour workday (Tr. 476). She could sit and stand for two hours continuously and six hours total during an eight-hour workday (Tr. 476). She did not require the use of a cane to ambulate (Tr. 476). She could occasionally reach overhead, and could frequently reach in all other directions, handle, finger, feel, push and pull, and operate foot controls (Tr. 477). She could occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, scaffolds, stairs, and ramps (Tr. 478). She could never tolerate exposure to unprotected heights or extreme cold, and could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme heat, and vibrations (Tr. 479). She could perform all of the following activities: shop; travel without a companion for assistance; ambulate without using a wheelchair, walker, or 2 canes or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, hand, and use paper/tiles (Tr. 480).

In August 2013, Plaintiff told Dr. Vanover that she was "very upset" because she had been asked to see another provider for an evaluation, and the evaluation indicated that she was able to work (Tr. 481). Plaintiff stated that she had been having a good deal of pain and stiffness, and Dr. Vanover explained to her that the pattern was typical of fibromyalgia (Tr. 481). She explained that while there would be times that she was able to do a little more than at other times, it did not mean that she could handle a full-time job (Tr. 481). She told Plaintiff that it remained her opinion that Plaintiff could not perform the duties of a full-time or part-time job (Tr. 481). Plaintiff reported that she had difficulty sleeping and was very stressed because of financial concerns and family stressors (Tr. 481). Dr. Vanover stated that Plaintiff would be disabled on that basis even if she was physically capable of working (Tr. 481). Dr. Vanover told Plaintiff that it might well have been one of her better days when the evaluation was scheduled (Tr. 481). Plaintiff responded that the examination was "in no way thorough enough" for the conclusions indicated in the evaluation (Tr. 481). Dr. Vanover stated that Plaintiff had 16 of the trigger points of fibromyalgia (Tr. 481). She explained to Plaintiff that it remained her opinion, based on the multiple examinations she had performed, that Plaintiff was permanently and totally disabled (Tr. 481). Plaintiff had no new problems other than stress (Tr. 481). Plaintiff's physical examination was unchanged from her previous visits, except for the notation that she had 16 of 18 recognized trigger areas for fibromyalgia (Tr. 482-83). Additionally, as opposed to the euthymic mood and appropriate affect of previous visits, Plaintiff had an anxious mood and tearful affect (Tr. 483). She was

6

awake, alert, well-nourished, well developed, and in no acute distress (Tr. 482). She had a limping gait (Tr. 482). Examination of her lumbar spine showed normal lumbar lordosis, a stable spine, and lumbar spine tenderness with restricted range of motion secondary to pain (Tr. 482). Plaintiff displayed appropriate judgment, good insight, and intact recent and remote memory (Tr. 483). Cardiovascular and respiratory findings were normal (Tr. 482).

[Doc. 13, pgs. 2-12].

At the administrative hearing, the ALJ took the testimony of Ms. Cathy Sanders, a vocational expert ["VE"]. He asked her a variety of hypothetical questions, all based upon the restrictions found by Dr. Wireman. At the light level of exertion, with Dr. Wireman's restrictions and a limitation to simple, unskilled work, Ms. Sanders gave three examples of work a person of plaintiff's age, educational and work background could perform. They were entry level office assistants, with 5,000 jobs in Tennessee and 460,000 in the nation; a half-range of entry level cleaners, with 6,000 in Tennessee and 278,000 in the nation; and cashiers, with 22,000 jobs in Tennessee and 1.2 million in the nation. (Tr. 43-45).

After deliberating on the testimony and evidence, the ALJ rendered his hearing decision on September 13, 2013. He first stated that the plaintiff was insured through December 31, 2015, and had not engaged in substantial gainful activity since December 23, 2010, her alleged onset date. He then found that she had the following severe impairments: polyarthralgia; degenerative disc disease of the cervical and lumbar spine; obesity; depressive disorder NOS; major depressive disorder, recurrent, severe without psychotic features; and generalized anxiety disorder. (Tr. 11). He found that she did not meet the requirements of any of the listing of impairments. In making this finding he found that plaintiff had mild restrictions in activities of daily living and social functioning, and moderate difficulties in concentration, persistence or pace, with no episodes of decompensation. (Tr. 12).

He then found that the plaintiff has the residual functional capacity ["RFC"] to perform light work with various qualifications. She is limited to sitting or standing for two continuous hours and walking for one continuous hour. He found she could sit for a total of six hours, stand for a total of six hours, and walk for a total of six hours in an eight hour workday. He found she could occasionally lift or carry up to 50 pounds, frequently lift up to 10 pounds, and continuously carry 10 pounds. He found she could occasionally use her hands for reaching overhead and frequently use her hands for reaching, handling, fingering, feeling, and pushing/pulling. She could frequently use "her feet for operation of foot controls and occasionally performing postural activities." He found that she could occasionally be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme heat, and vibration. He also limited her to "tasks which are simple and unskilled." (Tr. 13).

He then found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; her statements about the "intensity, persistence, and limiting effects of these symptoms are not entirely credible..." (Tr. 14). He then discussed the plaintiff's medical records.

He noted that x-rays by Dr. Odum only showed mild to moderate degenerative disc disease, and that she had a normal gate, no joint swelling, normal movements of all extremities, etc. He mentioned the report of Dr. Song, the rheumatologist, who opined she had early osteoarthritis or overuse pain. Dr. Song prescribed medication changes and stretching exercises. (Tr. 14).

He then discussed plaintiff's treatment by Dr. Vanover, which included a "limping

8

gait." Dr. Vanover "repeatedly encouraged the plaintiff to stay as active as possible, exercise daily, and lose weight." He noted the two visits to the William A. Davis Clinic in September of 2012 and April of 2013 for mental problems, noting that she was taking Loarzepam for anxiety and Cymbalta. Plaintiff was noted at these visits to have depression and "very poor coping strategies." These were her only visits to this clinic. (Tr. 15).

He then analyzed the consultative examination performed by Dr. Wireman at the request of the State Agency. He noted that Dr. Wireman found tenderness at 8 of the 18 fibromyalgia trigger points. He focused on the relatively extensive physical examination and the findings and Dr. Wireman's diagnoses. Next, the ALJ discussed the examination and diagnoses of Dr. Steward performed at the request of plaintiff's counsel. (Tr. 15-16).

He then stated that "the objective evidence fails to document an impairment which would be expected to preclude work" in accordance with his RFC finding. He noted her obesity, and that it "likely contributed to her back pain and arthralgia" in the opinion of Dr. Wireman, and that Dr. Vanover had often recommended weight loss. He found Dr. Vanover's diagnosis of fibromyalgia "not well supported" because "the clinical record fails to reveal at least 11 of 18 positive tender points on physical examination." He noted that her exams often showed no problems manipulating objects and normal gait and coordination. He stated she did not use an assistive device to ambulate, and had never been hospitalized for pain. He concluded that the "total case record supports a conclusion that the claimiant's polyarthralgia, cervical and lumbar degenerative disc disease, and obesity limit her "to the performance of the RFC found by the ALJ. Based upon all of this, he found that "the record as a whole" did not support her subjective allegations of disabling pain and other disabling

9

physical symptoms. (Tr. 16-17).

He then discussed the weight given to various medical and mental assessments. He gave Dr. Vanover's assessment dated June 19, 2013, "partial evidentiary weight," finding it "overly restrictive and not well supported by the total case record." On the other hand, he found Dr. Wireman's opinion "well supported by this own objective findings and the other objective findings of record." He thus gave Dr. Wireman's opinion great weight. (Tr. 17).

He then discussed the reports relating to plaintiff's mental impairments. With respect to Dr. Steward, the ALJ stated that the doctor's opinion that the plaintiff was permanently and totally disabled was within the area reserved to the Commissioner. As for his other findings, such as no useful ability to deal with stress and behave in an emotionally stable manner, etc., the ALJ stated that he did not give weight to those parts of Dr. Steward's opinion because it was "totally inconsistent with the longitudinal record." Also, the ALJ noted that "the claimant underwent the psychological evaluation that formed the basis of Dr. Steward's opinion not in an attempt to seek treatment for symptoms but rather through attorney referral and in connection with an effort to generate evidence for the appeal...." noting that "Dr. Steward was presumably paid for the report." He then stated that "although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored." (Tr. 18).

He then found, based upon the testimony of the VE, that there were a significant number of jobs which the plaintiff could perform. Accordingly, she was not disabled. (Tr. 19-20).

Plaintiff takes issue with the ALJ's findings both with respect to the plaintiff's

10

physical and mental impairments. Specifically, she contests that his handling of the opinions of Dr. Vanover and Dr. Steward mean that his RFC finding is not supported by substantial evidence.

With respect to Dr. Vanover, there is no doubt that she treated the plaintiff for quite some time, and that she was consistent in her opinions regarding the plaintiff's physical capabilities. It is of course likewise true that a treating physician's opinion is entitled to great weight, but only if well-supported by medically acceptable clinical and laboratory diagnostic techniques, and if it is not inconsistent with other substantial evidence in the record. *Hensley v. Astrue* 573 F. 3d 263 (6th Cir. 2009).

As for the ALJ's erroneous statement that "no treating source has limited the claimant's activities," such an error is harmless in light of the fact that he spends several paragraphs explaining why he does not believe the limitations opined by Dr. Vanover.

In that regard plaintiff points out that the ALJ did not specifically mention Dr. Vanover's August, 2013, treatment note (Tr. 481) and the reasons for not giving it great weight. However, as pointed out by the Commissioner, that treatment note is a reiteration of Dr. Vanover's medical assessment dated August 19, 2013 (Tr. 460-462). The ALJ thoroughly discussed Dr. Vanover's objective findings (Tr. 14-15), and gave her assessment only partial weight and found it too restrictive because he found (1) parts of it were not supported by Dr. Vanover's clinical findings, and (2) there was other evidence including x-rays and the findings of Dr. Odum and Dr. Song which supported a less restive finding. Also, there was the extensive examination of Dr. Wireman which led to Dr. Wireman's assessment which formed the entire basis for the ALJ's RFC finding. Dr. Wireman's

11

examination was thorough, and his conclusions are not extreme; they simply represent his conclusions of what the plaintiff can do in spite of the expected limitation she would have based upon his objective findings. He obviously did not give as much consideration to plaintiff's subjective complaints as her own physician did. But that is not at all improper. The Court simply cannot say that the ALJ's finding lacks substantial evidence, or that he did not explain the limited weight given to the treating physician.

With respect to Dr. Steward's mental evaluation, the issue of "disabled or not" is the ultimate issue, and is the province of the Commissioner to determine. However, it is extremely troublesome that the ALJ rejected the limitations of function opined by Dr. Steward, which are the legitimate aims of a mental assessment, without having any opinion of another mental health professional to back him up in that regard. It is true that the plaintiff has had limited treatment, but she has had some (Tr. 432-435), and was prescribed medication.

While it would be totally appropriate for the ALJ, as finder of fact, to find an opinion from another mental health source more in line with plaintiff's actual level of limitation than is indicated in the report of Dr. Steward, that evidence must in fact exist. Otherwise, the ALJ is practicing medicine. Dr. Steward submitted his report on May 16, 2013. The ALJ held his first hearing on June 28, 2013, and recognized the need for a *physical* consultative exam, which was obtained prior to the supplemental hearing on September 9, 2013. The hearing decision was rendered on September 13, 2013. The issue was obvious. It is true that the ALJ limited the plaintiff to simple, unskilled jobs. However, without some opinion from a mental health professional to contradict Dr. Steward, this oversight cannot be ignored. It renders the

12

adjudication regarding plaintiff's mental impairment not substantially justified.

Accordingly, it is respectfully recommended that the case be remanded for a consultative mental evaluation. It is therefore recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be GRANTED insofar as it seeks a remand, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be DENIED.[1]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).